UNITED STATES DISTRICT COURT
Western District of Kentucky
Bowling Green Division

| | | |
|---|---|---|
| Jason W. Durbin<br>*Plaintiff* | )<br>)<br>) | |
| v. | )<br>) | Case No. 1:19-cv-00184-GNS |
| Byerly Ford-Nissan, Inc., *et al.*<br>*Defendants* | )<br>)<br>)<br>) | |

**PLAINTIFF JASON W. DURBIN'S RESPONSE TO DEFENDANT
GLOBAL LENDING SERVICES, LLC'S MOTION TO DISMISS**

Comes Plaintiff Jason W. Durbin and hereby respond and objects to Defendant Global Lending Services, LLC ("GLS") Motion to Dismiss [DE 33] on grounds that:

1. Plaintiff Jason Durbin's complaint alleges a valid claim for relief under the FCRA that GLS made a credit inquiry of Plaintiff's credit which negatively impacted his credit rating without a permissible purpose.

2. GLS's motion does not allege that the Mr. Durbin's complaint fails to state the elements of a valid claim for relief under the FCRA. Rather, GLS's argument is that Mr. Durbin's complaint fails to negate its defense that it had reasonable belief that it had the right to request Mr. Durbin's credit report. This is not a proper ground for granting a motion to dismiss.

3. Finally, GLS's request for Mr. Durbin's credit reports was based on a Retail Installment Contract and Security Agreement ("RICS") between Mr. Durbin and Defendant Byerly Ford-Nissan, Inc. ("Byerly") that had been fully executed and the underlying vehicle sale consummated over a month before. Further, under the plain terms of the RICS, Byerly assigned of all of rights and interest in the RICS to a third entity on the same date that the RICS was fully executed. Therefore, because the RICS was complete and the contract had been assigned to another entity,

Byerly no longer had any interest in the underlying transaction or contract when GLS requested Mr. Durbin's credit reports.

In summary, GLS requested Mr. Durbin's credit report triggered by the RICS that was fully consummated more than a month before and under which Byerly had no rights, remedies, or obligations. Based on these facts, it was unreasonable for GLS to rely upon the RICS or to believe that it had a permissible purpose to request Mr. Durbin's credit reports.

**I.     Standard of Review**

> A motion to dismiss under Fed. R. Civ. Pro. 12(b)(6) requires the Court to construe the complaint in the light most favorable to the plaintiff, accept all of the complaint's factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of the claims that would entitle relief. *Meador v. Cabinet for Human Resources,* 902 F.2d 474, 475 (6th Cir.1990), *cert. denied,* 498 U.S. 867, 111 S.Ct. 182, 112 L.Ed.2d 145 (1990).

*Grindstaff v. Green*, 133 F.3d 416, 421 (6th Cir. 1998).

Under the pleading standards stated by the United States Supreme Court in *Bell Atl. Corp. v. Twombly,* 550 U.S. 554, 570 (2007) and *Ashcraft v. Iqbal,* 556 U.S. 662, 678 (2009) a complaint must plead specific facts as to a defendant that, if true, would create liability for the wrong alleged. *See also In re Darvocet, Darvon, & Propoxyphene Prods. Liab. Litig.,* 756 F.3d 917, 926 (6th Cir. 2014). The Court must treat all well-pleaded allegations of the complaint as true and construe the allegations in the light most favorable to the non-moving party. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.,* 508 F.3d 327, 336 (6th Cir. 2007). Here Plaintiff's pleadings and exhibits state facts in detail and provide objective examples supporting her claims.

"[A] court may consider exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss, so long as they

are referred to in the complaint and are central to the claims contained therein, without converting the motion to one for summary judgment." *E.g., Stein v. hhgregg, Inc.,* 873 F.3d 523, 528 (6th Cir. 2017) (citation omitted). Accordingly, this Court may consider Plaintiff's Exhibits and Appendices filed in support of her Response to Defendant GLS's motion to dismiss.

**II.    The Complaint States a Valid Claim for Relief**

"[A] consumer-plaintiff need allege only that her credit report was obtained for a purpose not authorized by the statute to survive a motion to dismiss; the defendant has the burden of pleading it obtained the report for an authorized purpose." *Nayab v. Capital One Bank (USA), N.A.*, 942 F.3d 480, 487 (9th Cir. 2019).

Plaintiff Durbin's complaint alleges that, on September 14, 2019, GLS made hard-credit inquiries for his Equifax, Experian, and Trans Union credit report. Complaint at ¶21-22, 35, DE 1. GLS does not deny making this inquiry. The complaint further alleges that GLS did not have a permissible purpose under the Fair Credit Reporting Act ("FCRA") for making these requests because Mr. Durbin did not apply for credit or initiate a credit transaction with GLS on September 14, 2019. *Id.* at ¶¶21-22, 35, 53-54.

In its motion to dismiss, GLS does not argue that it had a permissible purpose for requesting Mr. Durbin's credit report. Rather, GLS argues that it had *reason to believe* that it had the right to request Mr. Durbin's credit report.

GLS's state of mind (to the extent that a corporation can have a state of mind) has no bearing on the issue before the Court: Does the complaint state a valid claim for relief? But the facts of this case seriously call into question GLS' defense based on its "reason to believe it had a

permissible purpose" to make hard-credit inquiry for Mr. Durbin's Experian credit report on September 14, 2019.

### III. Relevant Factual Background

On or about August 12, 2019, Plaintiff Jason W. Durbin and his wife purchased a 2015 Ford Escape from Defendant Byerly. The Durbins financed the purchase of the Ford Escape by entering into the RICS. Complaint at ¶11, DE 1.

A true and accurate copy of the RICS is attached as Exhibit "A" to this response.

The RICS was dated August 12, 2019. *Id.*



Exhibit "A".

Byerly assigned the RICS to Transcend Credit Union ("Transcend") on August 12, 2019. Complaint at ¶12.

> **ASSIGNMENT BY SELLER**
> Seller sells and assigns this Retail Installment Contract and Security Agreement, (Contract), to the Assignee, its successors and assigns, including all its rights, title and interest in this Contract, and any guarantee executed in connection with this Contract. Seller gives Assignee full power, either in its own name or in Seller's name, to take all legal or other actions which Seller could have taken under this Contract. (SEPARATE AGREEMENT: If this Assignment is made "under the terms of a separate agreement" as indicated on page 1, the terms of this assignment are described in a separate writing(s) and not as provided below.)
>   Seller warrants:
>   A. This Contract represents a sale by Seller to Buyer on a time price basis and not on a cash basis.
>   B. The statements contained in this Contract are true and correct.
>   C. The down payment was made by the Buyer in the manner stated on page 1 of this Contract and, except for the application of any manufacturer's rebate, no part of the down payment was loaned or paid to the Buyer by Seller or Seller's representatives.
>   D. This sale was completed in accordance with all applicable federal and state laws and regulations.
>   E. This Contract is valid and enforceable in accordance with its terms.
>   F. The names and signatures on this Contract are not forged, fictitious or assumed, and are true and correct.
>   G. This Contract is vested in the Seller free of all liens, is not subject to any claims or defenses of the Buyer, and may be sold or assigned by the Seller.
>   H. A completely filled-in copy of this Contract was delivered to the Buyer at the time of execution.
>   I. The Vehicle has been delivered to the Buyer in good condition and has been accepted by Buyer.
>   J. Seller has or will perfect a security interest in the Property in favor of the Assignee.
>     If any of these warranties is breached or untrue, Seller will, upon Assignee's demand, purchase this Contract from Assignee. The purchase shall be in cash in the amount of the unpaid balance (including finance charges) plus the costs and expenses of Assignee, including attorneys' fees.

Exhibit "A".

The assignment to Transcend was "without recourse".

> UNLESS OTHERWISE INDICATED ON PAGE 1, THIS ASSIGNMENT IS WITHOUT RECOURSE.

*Id.*

The RICS was a fully executed contract. It was not made contingent on financing or any other event. As set forth in the assignment:

> D. *This sale* [under the RICS] *was completed* in accordance with all applicable federal state laws and regulations.
>
> E. [The RICS] is valid and enforceable in accordance to its terms.
>
> H. A completely file-in copy of this Contract was delivered to the Buyer [Mr. Durbin] at the time of *execution*.
>
>         *       *       *       *       *
>
> I. The Vehicle [the 2015 Ford Escape] has been delivered to the Buyer in good condition and has been accepted by the Buyer.

*Id.* (emphasis added).

On September 14, 2019, GLS made a hard-credit inquiry for Mr. Durbin's Equifax, Experian, and Trans Union credit reports. Complaint at ¶21-22, 35.

Mr. Durbin did not apply for credit or initiate a credit transaction with Byerly or GLS on September 14, 2019. *Id.* at ¶36.

As of the date of filing this response, GLS's September 14th hard-credit inquiry is still being reported on Mr. Durbin's Experian credit reports. Plaintiff's tendered First Amended Complaint at ¶62.

## IV. Hard-Credit Inquiries

That GLS made hard-credit inquiries for Mr. Durbin's credit report is important. A hard-credit inquiry should only occur when a consumer affirmatively initiates a credit transaction with the entity requesting the consumer's credit report.

The FCRA does not expressly create a distinction between "hard" and "soft" credit inquiries. Nevertheless, the distinction between hard and soft inquires flows directly from 15 U.S.C. §1681b(c)(3), which provides:

> Information regarding inquiries
>
> > Except as provided in section 1681g(a)(5)[1] of this title, a consumer reporting agency *shall not furnish* to any person a record of inquiries in connection with a credit or insurance transaction that is not initiated by a consumer.

(Emphasis added.)

Consumer reporting agencies classify every user's request to see a consumer report as either a "hard" or "soft" credit inquiry, depending on the type of inquiry made by the requesting party.

As explained on the Credit Karma website, which is run by Equifax and Trans Union:

---

[1] 15 U.S.C. §1681g concerns the disclosure of a consumer's credit file to the *consumer* and not to third-party users.

> There are two kinds of inquiries that can occur on your credit report: hard inquiries and soft inquiries. While both types of credit inquiries enable a third party, such as you or a lender, to view your credit report, only a hard inquiry can negatively affect your credit score.
>
> **What is a Hard Inquiry?**
> Hard inquiries occur when a financial institution, such as a lender or credit card issuer, checks your credit report when making a lending decision. For example, hard inquiries commonly take place when a consumer applies for a loan, credit card, or mortgage. **You typically have to authorize a hard inquiry**. Most important to note, **hard inquiries will lower your credit score by a few points and remain on your credit report for two years**. As time passes, the damage to your credit score will decrease until the hard inquiry falls off your credit report.
>
> **What is a Soft Inquiry?**
> Soft inquiries occur when a person or company checks your credit report as a background check, such as when a potential employer checks your credit, when you are "pre-approved" for credit card offers, and when you check your own credit score. **A soft inquiry can occur without your permission.** Soft inquiries may be recorded in your credit report, depending on the credit bureau**, but they won't affect your credit score in any way.**

https://www.creditkarma.com/article/hard_inquiries_and_soft_inquiries (visited February 17, 2020) (bolding added).

As explained on the myfico.com[2] website:

> Credit inquiries are requests by a "legitimate business" to check your credit.
>
> As far as your FICO® score is concerned, credit inquiries are classified as either "hard inquiries" or "soft inquiries"–**only hard inquiries have an affect on your FICO score.**
>
> Soft inquiries are all credit inquiries where your credit is NOT being reviewed by a prospective lender. These include inquiries where you're checking your own credit (such as checking your score in myFICO), credit checks made by businesses to offer you goods or

---

[2] "myFICO is the consumer division of FICO. Since its introduction 20 years ago, the FICO® Score has become a global standard for measuring credit risk in the banking, mortgage, credit card, auto and retail industries. **90 of the top 100 largest U.S. financial institutions use the FICO Score to make consumer credit decisions**." https://www.myfico.com/Company/AboutUs.aspx (visited February 17, 2020) (emphasis added).

> services (such as promotional offers by credit card companies), or inquiries made by businesses with whom you already have a credit account.
>
> **Hard inquiries are inquiries where a potential lender is reviewing your credit because you've applied for credit with them**. These include credit checks when you've applied for an auto loan, mortgage or credit card.... **A FICO score takes into account only *voluntary* inquiries that result from your application for credit.** The information about inquiries that can be factored into your FICO score includes:
>
> - Number of recently opened accounts, and proportion of accounts that are recently opened, by type of account.
> - Number of recent credit inquiries.
> - Time since recent account opening(s), by type of account.
> - Time since credit inquiry(ies).
> - **A FICO score does not take into account any involuntary inquiries made by businesses with whom you did not apply for credit**, inquiries from employers, or your own requests to see your credit report

www.myfico.com/crediteducation/questions/inquiry-credit-score.aspx (visited February 17, 2020) (bolding and emphasis added).

Whether a consumer reporting agency or FICO categorizes a credit inquiry as "hard" or "soft" depends directly on the user of the report and whether the user classifies its request as a voluntary or involuntary request, *i.e.* whether the request was made in connection with a credit transaction initiated by the consumer.

GLS's requests for Mr. Durbin's Equifax, Experian, and Trans Union credit reports on September 14, 2019 were involuntary, *i.e.* Mr. Durbin did not initiate a credit transaction with GLS on September 14, 2019. GLS's affirmative representations to Equifax, Experian, and Trans Union that Mr. Durbin had initiated a credit transaction with GLS were false. GLS's *defense* as stated in its motion to dismiss that it had reasonable belief to request Mr. Durbin's Equifax, Experian, and Trans Union credit report is refuted by the RICS.

**V.     GLS could not have had a Reasonable Belief that it had the Right to Request Mr. Durbin's Credit Reports on September 14, 2019.**

Based on the RICS, GLS could not have reasonably believed that Mr. Durbin had, through Byerly, applied for credit with GLS to purchase the 2015 Ford Escape. The RICS was not an application. It was a completed and executed contract. Further, on the face of the RICS, Byerly had no interest in the contract, as the contract had been assigned to Transcend Credit Union. Finally, the RICS was dated more than a month prior. There is simply no way, that upon review of RICS, GLS could have reasonably believed that Mr. Durbin had initiated a credit transaction with either GLS or Byerly on September 14, 2019. The cases relied on by GLS do not lead to a different result.

GLS cites to the case of *Wells v. Craig & Landreth Cars, Inc.*, 474 F. App'x 445 (6th Cir. 2012), which concerns a lawsuit and appeal brought by a *pro se* litigant. *Id.* at 446. *Wells* is a short opinion with little analysis. As to the claim under the FCRA, *Wells* simply states:

> There is nothing in Wells's amended complaint which might show that Capital One had reason to believe that she did not wish the dealership to file an application on her behalf. Thus, her allegations are insufficient because they do not indicate that Capital One intended to violate her rights under the Act or that it did so recklessly.

*Id.* at 447.

But here, Mr. Durbin's complaint and tendered first amended complaint does establish allegations and has a solid basis that shows that GLS did not and could not have had a reasonable belief that it had the right to request Mr. Durbin's Experian credit report on September 14, 2019. *See Young v. Harbor Motor Works, Inc.*, No. 2:07CV0031JVB, 2009 WL 187793 (N.D. Ind. Jan. 27, 2009).

In *Young*, the plaintiff-consumer took the proactive step of noting on his credit application that he was not permitting any entity to request his credit reports. *Id.* at *4. The *Young* Court concluded this fact precluded the defendant-lenders' motion to dismiss on grounds that that they had a reasonable belief that they had a right to request the plaintiff's credit reports:

> Young initiated the transaction to purchase a car from the dealer and was not informed that third party lenders would be requesting his credit report…. Young took the proactive measure of explicitly writing "NONE" on the line of the credit application following the phrase: "You are notified that your application may be submitted to (Name and Address required)." As a result, the credit applications indicate that only Honda Financial was authorized to obtain credit information about Young. Importantly, the Amended Complaint alleges that Honda Harbor submitted to Harris the credit application containing this written limitation. Therefore, although Young initiated the search for credit with the dealership and although Harris' credit search was in connection with that credit transaction, Young specifically limited who could check his credit to one entity—Honda Financial….Young alleges that the signature pages of the credit applications put Harris on notice that it did not have permission to run Young's credit check and thus Harris' unauthorized credit search violated the FCRA. Because Harris is alleged to have been on notice that it did not have permission to request Young's credit report based on the notation in the credit application that the application would not be submitted to any entity other than Honda Financial, the Court finds that the motion to dismiss fails on this basis.

*Id.*

Similar to *Young*, the RICS put GLS on clear and plain notice that Mr. Durbin was not currently applying for credit to purchase the 2015 Ford Escape. Rather, the RICS was a fully executed contract that had been consummated more than a month before. Further, the face of the RICS included an assignment that made clear that Byerly had no enforceable rights under the RICS.

### VI. The Court should not Dismiss this Case Based on GLS's Defense

GLS's motion to dismiss is not based on an alleged deficiency in the complaint. That is, GLS does not argue that the complaint fails to set forth all the elements of a valid claim. Rather, GLS's argument is that the complaint fails to disprove its defense that it had a reasonable belief that it had the right to request Mr. Durbin's credit reports. Failure to negate a defense in a complaint is not a proper ground for granting a motion to dismiss.

> "Under Kentucky law, the burden of proof when asserting an affirmative defense, like the statute of limitations, is on the party who raises it." *Hines v. Hiland,* No. 5:09–CV–00075–R, 2011 WL 1131521, at *2 (W.D.Ky. Mar. 25, 2011). As such, the burden is on the Defendants to show that the limitations period has run. Although Tomlin is not required to negate affirmative defenses in his Complaint, the BONY Defendants' "Rule 12(b)(6) [motion] will be granted if ... the claim shows on its face that relief is barred by an affirmative defense." *Riverview Health Inst. LLC v. Med. Mut. of Ohio,* 601 F.3d 505, 513 (6th Cir. 2010).

*In re Tomlin*, No. 15-20852, 2016 WL 1317412, at *19 (Bankr. E.D. Ky. Mar. 31, 2016). *See also Miles v. Marion Cty. Bd. of Educ.*, No. 2005-CA-000480-WC, 2005 WL 2174398, at *2 (Ky. Ct. App. Sept. 9, 2005) (holding that "[t]he burden of proof for asserting an affirmative defense" is on the defendant).

Nothing in the text of the complaint or the tendered first amended complaint shows that Mr. Durbin's claims are barred on their face.

### VII. Conclusion and Relief Requested

Mr. Durbin's complaint states a valid claim for relief under the FCRA. The complaint alleges that GLS made a hard-credit inquiry for his Equifax, Experian, and Trans Union credit reports on September 14, 2019 without a permissible purpose. A hard-credit inquiry only occurs when a consumer initiates a credit transaction with the entity requesting the consumer's credit

report. The complaint clearly and plainly alleges that Mr. Durbin did not initiate a credit transaction with GLS on September 14, 2019.

GLS's motion to dismiss does not attack the elements of Mr. Durbin's claims set forth in the complaint. Rather, GLS argues that it has a defense that should carry the day. But the facts of this case as set forth in the complaint and the tendered first amended complaint refute that defense.

In an abundance of caution, contemporaneously with this motion to dismiss, Mr. Durbin has moved to file his first amended complaint in this action. The first amended complaint makes more clear points made above and includes a copy of the RICS as an exhibit. Finally, the first amended complaint includes additional state-law claims of defamation and slander of credit against GLS for affirmatively and falsely representing to Equifax, Experian, and Trans Union that Mr. Durbin had initiated a credit transaction with GLS on September 14, 2019.

Therefore, the Court should DENY Defendant Global Lending Services, LLC's Motion to Dismiss [DE 33].

Respectfully submitted,

/s/ James H. Lawson
*Lawson at Law, PLLC*
115 S. Sherrin Avenue, Suite 5
Louisville, KY 40207
Tel:   (502) 473-6525
Fax:   (502) 473-6561
James@kyconsumerlaw.com
*Co-counsel for Plaintiff*
*Jason W. Durbin*

James R. McKenzie
*James R. McKenzie Attorney PLLC*
115 S. Sherrin Ave. Suite 5
Louisville, KY 40207
Tel:   (502) 371-2179
Fax:   (502) 257-7309

                                                                        jmckenzie@jmckenzielaw.com
                                                                        *Co-counsel for Plaintiff*
                                                                         *Jason W. Durbin*

## Certificate of Service

      I hereby certify that I have served a copy of the foregoing document through the Court's CM/ECF system this the 18th day of February 2020 on all counsel of record.

                                                                       /s/ James H. Lawson
                                                                       *Co-counsel for Plaintiff*
                                                                       *Jason W. Durbin*